**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

AHMAD SAQR, et al.,

Case No: 1:18-cv-542

                Plaintiff,

Dlott, J.

    v.

Bowman, M.J.

THE UNIVERSITY OF CINCINNATI, et al.,

                Defendants.

## REPORT AND RECOMMENDATION

On August 3, 2018, two brothers, Ahmad Saqr and Omar Saqr, filed suit against the University of Cincinnati and the University of Cincinnati College of Medicine (collectively "UC").[1]  Plaintiffs allege that Defendants violated the Americans with Disabilities Act, the Rehabilitation Act, and Title VI as well as related state laws, when UC's Performance and Advancement Committee recommended Plaintiffs' respective dismissals from UC's medical school program and those recommendations were upheld by an appeal panel.

In lieu of an answer, Defendants filed a motion to dismiss based upon a lack of federal jurisdiction and for failure to state a claim. (Doc. 6).  Plaintiffs filed a response in opposition to that motion, (Doc. 9), to which Defendants filed a reply. (Doc. 10).   For the reasons that follow I now recommend that UC's motion be GRANTED IN PART and DENIED IN PART.

---

[1]Despite being identified as separate Defendants, UC states that the University of Cincinnati College of Medicine is not a separate legal entity from the University of Cincinnati.  Plaintiffs' complaint and memorandum in opposition inconsistently refer to UC as both a single "Defendant" and "Defendants."

## I.    Standard of Review

Unlike a motion for summary judgment, a motion to dismiss is directed to the sufficiency of the pleadings, with the Court's review limited accordingly. Thus, in evaluating the pending motion under Rule 12(b)(6), the Court is required to "accept all well-pleaded factual allegations of the complaint as true and construe the complaint in the light most favorable to the plaintiff." *Dubay v. Wells,* 506 F.3d 422, 426 (6th Cir. 2007) (internal quotation marks and additional citation omitted). A complaint must contain more than "labels and conclusions" under the standards established in *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S. Ct. 1955 (2007) and *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937 (2009). At the same time, Rule 8(a) of the Federal Rules of Civil Procedure sets forth only a "notice pleading" standard and does not require detailed factual allegations. For that reason, all reasonable inferences are to be construed in favor of the plaintiffs, and a complaint generally will survive under Rule 12(b)(6) standards if it contains sufficient factual content "that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Hensley Mfg. v. ProPride*, *Inc.*, 579 F.3d 603, 609 (6th Cir. 2009) (quoting *Iqbal,* 129 S.Ct. at 1949).

## II.    Plaintiffs' Claims

### A.    Count I – Title II ADA Claim

#### 1.    Whether the Allegations State a Title II Claim

Many of Plaintiffs' allegations and several claims focus on alleged discrimination related to Plaintiffs' status as Egyptian Muslim males. (*See, e.g.* Doc. 1 at ¶18, alleging that "100% of the students who were dismissed from Defendant's program in recent years were minority students."). However, three of the articulated claims focus on Plaintiffs' alleged learning disabilities. In Count I of the Complaint, Plaintiffs allege that UC denied

them accommodations and discriminated against them in violation of the Americans with Disabilities Act of 1990 ("ADA"). Although Plaintiffs fail to identify the precise provision of the ADA under which they proceed, the parties agree that the claims arise under Title II of the ADA. That provision provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

In its motion, UC argues that Plaintiffs' allegations are so conclusory as to be insufficient to state any claim under Title II and/or that Plaintiffs' ADA claims should be dismissed on the basis of UC's Eleventh Amendment immunity. The undersigned begins with an examination of whether – apart from the immunity issue – Plaintiffs' allegations are otherwise sufficient to state any claim under Title II.

Plaintiffs allege that prior to their respective dismissals from the medical school, UC's Performance and Advancement Committee ("PAC") learned that each Plaintiff had one or more disabilities and needed accommodations. Plaintiffs have alleged that they sought but were refused "proper accommodations" by UC.[2] (Doc. 1, Complaint at ¶¶ 36, 49, 64). Plaintiff Ahmad more specifically alleges that he has ADHD and a general anxiety disorder, (*Id.* at ¶34), while Plaintiff Omar alleges that he suffers from anxiety, depression, and ADHD. (*Id.* at ¶¶ 46-49). Plaintiff Ahmad alleges that "[i]t was circulated that Ahmad passed his classes when he received support, but when [he] did not receive the same level [of] support of his classmates, it [led] to failure." (*Id.* at ¶30). Plaintiffs jointly assert that they "could have performed in the program had Defendant provided reasonable

---

[2]Plaintiffs allege that the PAC is comprised of a group of faculty. Within the limited scope of review applicable to the present motion, the undersigned finds it reasonable to construe Plaintiffs' allegations concerning the PAC and/or the appeal panel as attributable to UC.

accommodations," and that they "would not have been dismissed if they did not have a disability." (*Id.* at ¶67). Thus, as a result of their disabilities, Plaintiffs assert they were denied access to a program of education at the University of Cincinnati, College of Medicine and ultimately were dismissed from that program. (*See id.* at ¶¶ 34-40, 46-54, 59-68).

While conceding that Plaintiffs have sufficiently alleged that they suffer from disabilities, UC argues that Plaintiffs have failed to "establish" the remaining elements of a Title II claim, such as demonstrating they were otherwise qualified to continue in medical school with or without reasonable accommodations, that they conveyed to UC officials their formal diagnoses, that they requested accommodations in a legally sufficient manner, and that the school failed to provide accommodations. *See generally Kaltenberger v. Ohio College of Podiatric Medicine*, 162 F.3d 432, 437 (6th Cir. 1998). It is true that Plaintiffs' allegations are relatively conclusory, insofar as the allegations fail to identify specific individuals other than the "Defendant," UC's PAC, or UC's "Appeal Panel." At the same time, however, UC relies upon cases that were decided on summary judgment, not on a motion to dismiss. In so doing, UC misconstrues the notice pleading standard, which requires only allegations that give rise to reasonable inferences to support Plaintiffs' Title II claims.

The issue is undoubtedly close given the paucity of factual detail. However, in the context of the present motion, it is appropriate to give the Plaintiffs the benefit of the doubt. Thus, reviewing the allegations as a whole, the undersigned concludes that the allegations are not so deficient that dismissal is warranted but reasonably construes the allegations as stating claims by each Plaintiff under Title II of the ADA. *Contrast Cooley v. Western Michigan University Cooley Law School*, 2017 WL 4324944 (E.D. Mich. Sept.

4

29, 2017) (holding that plaintiff's allegation that state had failed to conduct an impartial investigation of discrimination complaint against law school did not state a claim under Title II).

UC urges this Court to consider further whether it is entitled to at least partial dismissal based upon a further parsing of Plaintiffs' claims. Title II case law reflects a variety of more specific legal theories beyond the intentional discrimination proscribed by the statutory language, including disparate treatment, disparate impact, and a failure to accommodate. Distinguishing among those legal theories, UC argues in its motion that Plaintiffs' Title II claim should be dismissed based upon a failure to state a "failure to accommodate" claim. In its reply brief,[3] UC additionally argues that Plaintiffs have failed to sufficiently identify similarly situated individuals in a manner that would support a "disparate treatment" claim under the ADA. (Doc. 10 at 9). *Contrast generally James v. Hampton*, 592 Fed. Appx. 449, 461 (6th Cir. Jan. 7, 2015) (permitting disparate treatment claim of race discrimination by an African-American state court judge to proceed where she went beyond "conclusory allegations" to identify "specific individuals and… instances of their misconduct.").

Plaintiff's complaint contains only one ADA "discrimination" claim, and Sixth Circuit case law does not wholly support the presumption that each legal theory of liability can or should be viewed as a separate claim under Title II. Indeed, the Sixth Circuit has not defined whether, or to what extent, a plaintiff is required to further identify the legal theories under which he proceeds, once he has included sufficient allegations to state a

---

[3]Although UC initially argued against the viability of a disparate treatment theory under the Rehabilitation Act, (*see* Doc. 6 at 12-15), UC's opposition to a construed "disparate treatment" claim under Title II of the ADA was first presented in its reply memorandum. As a rule, the Court will not consider new arguments presented for the first time in a reply.

claim of intentional discrimination under Title II. The parameters of the theories of liability arguably overlap one another, and the distinctions between theories are often poorly defined. Nevertheless, some ADA cases have "distinguished intentional discrimination claims from disparate-impact and reasonable-accommodation claims." *United States Society for Augmentative v. Lyon*, 2016 WL 6563422, at *2 (E.D. Mich., Nov. 4, 2016) (citing *Everson v. Leis*, 412 Fed. Appx. 771, 784 n.6 (6th Cir. 2011) (Moore, J., dissenting)). In light of the undersigned's conclusion that Plaintiffs have adequately stated the essential elements of a Title II claim, and the lack of controlling case law requiring further delineation of the legal theories upon which that claim is based, the undersigned declines UC's invitation to dismiss based on a "failure to accommodate" claim and/or theory of recovery under Title II. *See generally Anderson v. City of Blue Ash*, 798 F.3d 338, 357 (6th Cir. 2015) (setting forth three elements of prima facie case of intentional discrimination under Title II of ADA).

### 2. Whether Sovereign Immunity Bars Plaintiffs' Title II Claim

Having determined that Plaintiffs have adequately pleaded Title II claims against UC, the Court must next determine whether UC is immune from suit for those claims. States are entitled to sovereign immunity from suit under the Eleventh Amendment of the Constitution. *See Johnson v. University of Cincinnati*, 215 F.3d 561, 571 (6th Cir. 2000). While not contesting UC's assertion that it is an arm of the state, Plaintiffs point out that Congress has expressed an unequivocal desire to abrogate Eleventh Amendment immunity for violations of the ADA. *See* 42 U.S.C. § 12202. However, "the Supreme Court has held that Congress's attempted abrogation is only valid in limited circumstances, depending upon the nature of the ADA claim." *Babcock v. Michigan*, 812 F.3d 531, 534 (6th Cir. 2016).

In *United States v. Georgia*, 546 U.S. 151 (2006), the Supreme Court resolved a Circuit split concerning whether, and to what extent, the abrogation of Eleventh Amendment immunity was a valid exercise of Congress's authority for claims filed by a plaintiff under Title II of the ADA.[4]  In *Georgia*, the Supreme Court held that Congress had validly abrogated a state's immunity for the Title II claims filed by a paraplegic prisoner plaintiff, and provided guidance for lower courts to resolve similar immunity issues on a claim-by-claim basis in future cases.  To assess whether any particular Title II claim may proceed, the Supreme Court directed courts to determine:

> (1) which aspects of the State's alleged conduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid.

*Id.*, 546 U.S. at 159.   Here, the undersigned has resolved the first portion of *Georgia* in Plaintiffs' favor, concluding that Plaintiffs' allegations are sufficient to state a claim that UC's failure to provide accommodations to each of the two Plaintiffs, and subsequent dismissal from the medical school program, constituted intentional discrimination in violation of Title II.   *See Haas v. Quest Recovery Servs., Inc.* ("*Haas II*"), 247 Fed. Appx. 670, 672 (6th Cir. 2007) (holding that the Eleventh Amendment immunity issue should be addressed "only after finding a viable claim under Title II").

Under the second portion of the *Georgia* inquiry, the undersigned must determine whether Plaintiffs' allegations are reasonably construed as violating the Fourteenth

---

[4]Previously, the Sixth Circuit had held that the State of Ohio was immune from suit under the Eleventh Amendment and that Congress had not effectively abrogated Ohio's immunity under the ADA, although the court also held that the plaintiff had failed to state any Title II claim.  *Haas v. Quest Recovery Servs.*, Inc., 174 Fed. Appx. 265 (6th Cir. 2006).  Following *Georgia*, the Supreme Court granted the Haases' petition for certiorari, vacated, and remanded for reconsideration. *Haas v. Quest Recovery Servs., Inc.*, 127 S. Ct. 1121 (2007).  In *Haas II*, the Sixth Circuit affirmed based upon its conclusion, as re-affirmed, that the plaintiff had failed to state a Title II claim and therefore failed to satisfy the first prong of the *Georgia* inquiry.

Amendment.  In *Georgia*, it was undisputed that plaintiff's allegations stated a plausible claim that prison officials had violated the Eighth Amendment.

> Goodman urges, and the State does not dispute, that this same conduct that violated the Eighth Amendment also violated Title II of the ADA…. In fact, it is quite plausible that the alleged deliberate refusal of prison officials to accommodate Goodman's disability-related needs in such fundamentals as mobility, hygiene, medical care, and virtually all other prison programs constituted "exclu[sion] from participation in or ... deni[al of] the benefits of" the prison's "services, programs, or activities." 42 U.S.C. § 12132.

*Id.*, 546 U.S. at 157 (additional citations omitted).  Because the Due Process Clause of the Fourteenth Amendment incorporates the Eighth Amendment's fundamental guarantee against cruel and unusual punishment, the Supreme Court found the plaintiff's allegations to simultaneously state claims under both Title II and the Fourteenth Amendment.  Because the plaintiff had alleged a Fourteenth Amendment violation that was entirely co-extensive with his Title II claim, the Supreme Court concluded that the state's Eleventh Amendment immunity was effectively abrogated under the Fourteenth Amendment for that claim.

Unlike in *Georgia*, Plaintiffs here have not identified *any* constitutional violation by UC, much less a violation of the Fourteenth Amendment.   Plaintiffs concede as much,[5]

---

[5]Plaintiffs argue in a cursory fashion that that their Title II claims are not barred by sovereign immunity because the same allegations "support an inference that Plaintiffs were treated differently because of their disability compared to other students who requested accommodations…specifically other non-minority students." (Doc. 9 at 5, emphasis added).   However, Plaintiffs' one-sentence argument does not point to specific allegations or provide any explanation for construing the allegations as stating a Fourteenth Amendment claim.   While "reasonable" inferences must be drawn in favor of the non-moving party, the undersigned cannot find "reasonable" a construction that is wholly unsupported.  *See generally Babcock v. Michigan*, 812 F.3d at 534 (clarifying that "an alleged violation of the Equal Protection Clause based on heightened scrutiny as a member of a suspect class, as opposed to an alleged Due Process Clause violation, cannot serve as a basis for Title II liability," internal citations omitted).   Plaintiffs' complaint is devoid of "rational basis" allegations or any other clearly stated constitutional claim. *Compare Mingus v. Butler*, 591 F.3d 474, 482-483 (6th Cir. 2010) (In case where state had conceded that facts would show a violation of Title II, plaintiff had alleged misconduct that "*actually* violated the Fourteenth Amendment" when he alleged under the Equal Protection Clause there was "*no rational basis* for the classification allowing able bodied prisoners, and those with medical problems less serious than Plaintiff's, as qualifying for a single-occupancy room.") (emphasis added).

glossing over the second part of the *Georgia* inquiry in order to focus on the third (alternative) inquiry – the determination of whether, for Title II claims that do not violate the Fourteenth Amendment, Congress's abrogation of sovereign immunity is "nevertheless valid." *See Georgia*, 546 U.S. at 159; *accord Toledo v. Sanchez*, 454 F.3d 24, 33-34 (1st Cir. 2006) (moving on to third inquiry after determining that plaintiff had failed to allege Fourteenth Amendment violation).

To determine whether the abrogation of sovereign immunity is valid for a Title II claim that does *not* implicate the Fourteenth Amendment, the third portion of the *Georgia* inquiry incorporates the "congruence and proportionality" test set forth in *City of Boerne*, 521 U.S. 507, 520-521 (1997).

> Congress does not enforce a constitutional right by changing what the right is. It has been given the power "to enforce," not the power to determine what constitutes a constitutional violation. Were it not so, what Congress would be enforcing would no longer be, in any meaningful sense, the "provisions of [the Fourteenth Amendment]."
>
> While the line between measures that remedy or prevent unconstitutional actions and measures that make a substantive change in the governing law is not easy to discern, and Congress must have wide latitude in determining where it lies, the distinction exists and must be observed. There must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end. Lacking such a connection, legislation may become substantive in operation and effect. History and our case law support drawing the distinction, one apparent from the text of the Amendment.

*City of Boerne v. Flores*, 117 S.Ct. at 2164, 521 U.S. at 519–20.

In conducting the "congruence and proportionality" inquiry, a court must determine: (1) the fundamental right that Congress sought to enforce; (2) whether there is a history of unconstitutional discrimination that supports Congressional determination that prophylactic legislation was necessary; and (3) whether Title II is an appropriate response. *See Tennessee v. Lane*, 541 U.S. 509, 520-23 (2004); *Bourne*, 521 U.S. at

519 (holding that Congressional power "extends only to 'enforcing the provisions of the Fourteenth Amendment,'" additional internal citation omitted). In both *Lane* and *Georgia*, the Supreme Court resisted any temptation to conclude that Congress's abrogation of immunity would be valid for *any* claim filed under Title II, reminding lower courts that context matters. *See Lane,* 541 U.S. at 530 (declining to consider Title II as "an undifferentiated whole," and explaining "Whatever might be said about Title II's other applications, the question presented in this case is not whether Congress can validly subject the States to private suits for money damages for failing to provide reasonable access to hockey rinks, or even to voting booths, but whether Congress had the power… to enforce the *constitutional* right of access to the courts.") (emphasis added). In their memorandum in opposition to UC's motion, Plaintiffs maintain that just as *Lane* established the valid abrogation of immunity under Title II for cases involving the constitutional right of access to the courts and *Georgia* established the valid abrogation of immunity for Title II claims that violate the Eighth and Fourteenth Amendments, most Circuits have concluded that the abrogation of immunity for Title II claims is valid for *any* claims involving a program of "public education" even when *no* constitutional right is at issue. Thus, Plaintiffs propose that Congress has validly abrogated immunity for all Title II claims based on alleged discriminatory animus in the broad category of programs of "public education," regardless of the type of educational program.

The breadth of the waiver of sovereign immunity proposed by Plaintiffs cannot be harmonized with the language of *Lane* and *Georgia*, which strongly suggests that the waiver of immunity for at least some programs or services (i.e., access to state owned hockey rinks) might not be valid. The undersigned agrees with UC that *Lane* and *Georgia* emphasize that context controls, particularly when the Title II claim is not based on any

constitutional right.

UC does not contest that Congress has validly abrogated immunity for some claims based upon educational programs, but argues that *Georgia* requires a sharp focus on the precise type of educational "program" on which the Title II claim is based. Applying this nuance, UC argues that the abrogation of immunity for a claim of discrimination in the professional school context is overbroad and constitutes an invalid and unconstitutional expansion of Congress's power. After all, unlike the right to access the courts at issue in *Lane* or the prohibition against cruel and unusual punishment at issue in *Georgia*, the right to public education is not a "fundamental" right.[6] *See Carten v. Kent State University*, 282 F.3d 391, 395 (6th Cir. 2002) (pre-*Georgia* case holding that Title II claims by graduate student sounding in equal protection rather than due process were barred by sovereign immunity, in part because claim sought access to education – a lesser right than participation in judicial proceedings). Additionally, "[p]ersons with disabilities 'are not a suspect class for purposes of an equal protection challenge.'" *Crochran Through Shields v. Columbus City Schools*, 278 F. Supp.3d 1013, 1020 (S.D. Ohio 2017) (quoting *S.S. v. E. Ky. Univ.*, 532 F.3d 445, 457 (6th Cir. 2008) (additional citation omitted)). Still, the right to education has been recognized as "vital" and in Title II, Congress expressed a clear intent to protect that right for persons with disabilities. *See generally Ass'n for Disabled Americans, Inc. v. Fla. Int'l Univ.*, 405 F.3d 954, 958 (11th Cir. 2005) ("the

---

[6]Courts generally limit the definition of "fundamental" rights to those based upon specific constitutional provisions. *See, e.g., Doe v. Bd. of Trustees of U. of Illinois*, 429 F. Supp.2d at 939 (holding that "education, despite its undoubted importance, is not considered by the Supreme Court to be a fundamental constitutional right," citing *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 35-37 (1973)); *accord Cunningham v. U of N.M. Bd. of Regents*, 779 F. Supp. at 1279 (acknowledging that education is not a fundamental right but holding that Congressional abrogation of immunity for "higher education" is still valid based upon published case law in First, Third, Fourth and Eleventh Circuits, without drawing distinctions between undergraduate education and professional school).

constitutional right to equality in education, though not fundamental, is vital to the future success of our society," citing *Brown v. Board of Education*, 347 U.S. 483, 493 (1954)).

In support of its position that immunity has been validly abrogated for discrimination at the professional school level, Plaintiffs rely on two pre-*Georgia* and two post-*Georgia* cases from the First, Third, Fourth, and Eleventh Circuits, as well as a handful of published and unpublished district court cases. *See e.g., Bowers v. Nat'l Collegiate Athletic Ass'n*, 475 F.3d 524, 555 (3d Cir. 2007); *Toledo v. Sanchez*, 454 F.3d 24; *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474 (4th Cir. 2005); *Ass'n for Disabled Americans*, 405 F.3d 954; *see also McCollum v. Owensboro Community & Tech. College*, 2010 WL 5393852 at n.1 (W.D. Ky. Dec. 22, 2010) (stating that "Title II of the ADA validly abrogates sovereign immunity with respect to public education."). While all four Circuit cases broadly upheld the abrogation of immunity for claims involving "public education," it is worth noting that three concerned claims at the undergraduate level. The only case involving a claim in post-graduate education (law school) was the pre-*Georgia* claim presented in *Constantine.* However, Constantine did not consider whether professional or graduate school programs deserve special consideration, and the Fourth Circuit's overarching analysis included sweeping language about the validity of abrogation for all Title II claims that is arguably incompatible with *Georgia. Accord Guttman v. Khalsa*, 669 F.3d 1101, 1117 (10th Cir. 2012) (distinguishing *Constantine* as inappropriately reading *Lane* as holding that Title II survives the first two prongs of the *City of Bourne* inquiry in all cases); *see also Constantine*, 411 F.3d at 487, 489 (interpreting *Lane* as holding that Title II was validly enacted as a response to a history and pattern of disability discrimination in *all* areas of public services or programs, reasoning that Title II "presents fewer congruence-and-proportionality concerns than

does Title I").

Examining the two post-*Georgia* Circuit court cases, the clearest rationale for an expansive view of the abrogation of immunity for "public education" at all levels is set forth in *Toledo v. Sanchez.* There, the First Circuit concluded that the abrogation of immunity for claims against a public university by an allegedly disabled undergraduate student was validly applied to "*all levels* of public education," expressly rejecting the contention that the court should narrow its focus to evaluate "the validity of Title II [immunity only] as it applies to the conduct of public *universities*." *Id.* at 36 (emphasis added). Citing *Tennessee v. Lane*, the First Circuit reasoned that "[t]he Supreme Court's broad treatment of judicial services suggests that we should consider Title II as it applies to public education in general." *Id.*

In contrast to the reasoning of *Toledo*, however, *Lane* involved a "fundamental" and clearly constitutional right of access to the courts. Nevertheless, in *Bowers*, the Third Circuit reached a similar conclusion. There, an athlete who suffered from a learning disability had filed suit against the NCAA and several universities, alleging in part that the denial of academic eligibility based upon his failure to take required core courses in high school violated the ADA when they ceased recruiting him as a high school senior and/or as a college freshman. Among the multiple issues resolved in a complex consolidated appeal was whether the University of Iowa was entitled to sovereign immunity for the plaintiff's Title II claim. Answering that query in the negative, the *Bowers* court upheld the abrogation of sovereign immunity for any student seeking entrance to a college or university based upon a denial of access to "public education," relying heavily on the pre-*Georgia* decisions by the Fourth and Eleventh Circuits as well as the First Circuit's post-*Georgia* decision in *Toledo*:

As the Fourth Circuit observed in *Constantine,* Congress limited the scope of Title II in several respects. First, the statute only protects "qualified individuals with a disability." Second, Title II permits States to limit participation in their programs and activities for all other lawful reasons. Third, Title II only requires States to make "reasonable modifications" to accommodate the disabled, thus protecting the States from having to compromise essential eligibility criteria for public programs. Finally, States are able to make available other accommodations if structural modifications of physical structures are too burdensome. 411 F.3d at 488–89. For those reasons, and against the backdrop of discrimination against disabled students, the *Constantine* court concluded that Title II was valid legislation as applied to public education. *Id.* at 490. *See also Toledo,* 454 F.3d at 40 ("Title II's prophylactic measures are justified by the persistent pattern of exclusion and irrational treatment of disabled students in public education, coupled with the gravity of the harm worked by such discrimination."); *Assoc. for Disabled Americans, Inc.,* 405 F.3d at 959 ("Discrimination against disabled students in education affects disabled persons' future ability to exercise and participate in the most basic rights and responsibilities of citizenship, such as voting and participation in public programs and services. The relief available under Title II of the ADA is congruent and proportional to the injury and the means adopted to remedy the injury.").

*Bowers*, 475 F.3d at 555–56. While the above reasoning *could* be used to conclude that Title II validly waives state immunity for the claims presented, other courts have been more circumspect about sweeping away Eleventh Amendment immunity for any and all claims related to "public education." *See e.g., W.H. by and through M.H.D.R. v. Tenn. Dept. of Ed.*, 2016 WL 236996 at 9 (M.D. Tenn. Jan. 20, 2016) (holding that "[i]n the absence of express guidance from the Sixth Circuit, the court is swayed by …other circuits' holdings…with respect to the right to public *primary* education" despite the fact that education is not a constitutional right) (emphasis original).

The undersigned is persuaded by the reasoning of courts that have squarely confronted the same issue that the distinction between other educational programs and professional school education is an important one. In *McCulley v. Univ. of Kansas School of Medicine*, 2013 WL 1501994 at *3 (D. Kan. Apr. 10, 2013), the court dismissed a

medical student's Title II claim for monetary damages after finding no showing of "historical discrimination in medical schools," thereby refuting any conclusion under the *City of Bourne* test that Title II is "proportional, congruent, or responsive to historical unconstitutional behavior" by medical schools. *McCulley* reasoned that a medical school degree differs substantially from other educational programs, because it is a professional degree that leads to a specific occupation. *Accord Guttman v. Khalsa*, 669 F.3d 1101, 1125 (10th Cir. 2012) (upholding immunity against claim by disabled doctor relating to revocation of medical license because the right to practice a chosen profession is not a "fundamental right" and Title II cannot be viewed as proportional to any identified pattern of historic discrimination in professional licensing).

Other courts, like *McCulley*, draw the abrogation-of-immunity line at Title II claims alleging discrimination at the post-graduate level. *See Shaikh v. Texas A&M University College of Medicine*, 739 Fed. Appx. 213, 225 (5th Cir. 2018) (*per curiam*, holding that medical student failed to state Fourteenth Amendment claim, and affirming grant of immunity by trial court against Title II claim despite lower court's incomplete analysis, because medical student failed to provide any "meaningful argument that Congress's purported abrogation is 'nevertheless valid' in this case"); *Doe v. Board of Trustees of University of Illinois*, 429 F. Supp.2d 930, 939 (N.D. Ill. 2006) (granting immunity against claim by former student with learning disabilities dismissed from medical and doctoral programs, disagreeing with Fourth and Eleventh Circuits and holding that Title II "as applied to the postgraduate state university program at issue in this case, exceeds Congress's power" to abrogate Eleventh Amendment immunity); *Rittenhouse v. Bd. of Trustees of So. Illinois University*, 628 F. Supp.2d 887 (S.D. Ill. 2008) (citing reasoning of *Doe* as "compelling" and finding immunity against Title II claim filed by law school

student).

Neither the Sixth Circuit nor any district court within this circuit has directly considered or provided reasoned analysis of this precise issue. *But see Frank v. University of Toledo*, 621 F. Supp.2d 475 (N.D. Ohio 2007) (citing *Bowers* and *Toledo* and holding that abrogation of state sovereign immunity validly applies to all "public higher education" for claim by student in Ph.D. program, without discussion of post-graduate nature of program). The only published Sixth Circuit case involving graduate student education is *Carten v. Kent State University*, 282 F.3d 391, a pre-*Georgia* case that held that sovereign immunity barred the plaintiff's claims, without considering the import of differences between undergraduate and professional school educational programs.

Plaintiffs cite two cases from other courts involving medical students. However, one of those cases chose not to reach the issue, while the other did not address whether access to professional school warrants different treatment.[7] *See, e.g., Dean v. University at Buffalo School of Medicine and Biomedical Sciences*, 804 F.3d 178, 193-195 and n.9 (2d Cir. 2015) (noting a "growing fracture among the district courts in this Circuit" but declining to reach issue of whether immunity was validly abrogated for Title II for "discrimination in access to public higher education"); *Cunningham v. Univ. of N.M.*, 779 F. Supp.2d 1273 (D.N.M. 2011) (holding that Congressional abrogation of immunity for higher education is valid based upon Circuit cases, but without further discussion).[8]

---

[7]The undersigned has located other cases involving medical students that reveal a similar lack of analysis of the issue. *See generally*, *Duncan v. University of Texas Health Science Center at Houston*, 469 Fed. Appx. 364 (5th Cir. 2012) (holding without elaboration that trial court erred in granting immunity on Title II claim by medical student, but alternatively holding that claim would not have survived summary judgment); *Shurb v. University of Texas Health Science Center at Houston – School of Medicine*, 2013 WL 4096826 at n. 8 (S.D. Texas Aug. 13, 2013) (dismissing claim of immunity via footnote as "unpersuasive").

[8]Plaintiffs also cite *Sarkissian v. W. Va. Univ. Bd. of Governors*, 2007 WL 1308978 (N.D.W.V. May 3, 2007), in which a doctor who presumably had completed medical school prior to beginning a residency program alleged he had been dismissed because of his ADHD. Like the two cases involving medical students, the

In one of the few cases cited by Plaintiffs that addresses a post-graduate claim, the district court briefly noted that the claim challenged access to a PhD program, but held that Title II abrogated immunity even for claims at the post-graduate education level. *See Novak v. Bd of Trustees of So. Ill. University*, 2012 WL 5077649 (S.D.Ill. Oct. 18, 2012). However, *Novak* is unpersuasive because that court mistakenly reasoned that "[t]he First, Third, Fourth, and Eleventh Circuits have extended *Lane* to post-graduate state universities, finding Title II of the ADA to be a congruent and proportional response." *Id.* at *5 (emphasis added). As stated, only the Fourth Circuit's opinion in *Constantine* involved a claim by a law student rather than an undergraduate student. Since *Georgia* was decided in 2006, no Circuit court has squarely addressed the issue of whether a claim brought in the professional graduate school context might result in a different outcome. Consistent with the claim-by-claim approach required by both *Lane* and *Georgia*, and the analysis of several district courts that have addressed the issue, I conclude that the abrogation of immunity is not valid for Plaintiffs' Title II ADA claims of denial of access to medical school. Therefore, UC is entitled to dismissal of Plaintiffs' Title II claims for monetary damages.

### 3. Whether the Statute of Limitations Bars Ahmad's Claim

UC's motion also seeks dismissal of Plaintiff Ahmad's Title VI discrimination, ADA, and Rehabilitation Act claims based upon a statute of limitations defense. The parties agree that all of Plaintiffs' claims are subject to a two-year statute of limitations defense. *See McCormick v. Miami Univ.*, 693 F.3d 654, 662 (6th Cir. 2012) (ADA and Rehabilitation Act); *Brooks v. Skinner*, 139 F. Supp.3d 869, 880-881 (S.D. Ohio 2015) (Title VI). This

---

court in *Sarkissian* failed to discuss any distinctions and simply equated the professional *residency program* with "public higher education." *See id.,* at *8 (relying on *Constantine*, holding that Fourth Circuit had settled issue on valid abrogation of immunity for any Title II claim based upon access to "public higher education").

suit was filed on August 3, 2018; therefore, any claims that arose more than two years prior to that date are time-barred.

Plaintiffs' complaint includes several dates concerning Plaintiff Ahmad's claims: August 2010, June 29, 2016, August 2, 2016, and August 4, 2016.  (Doc. 1 at ¶¶ 26, 27, 28, 30).   Typically, a statute of limitations defense is raised in a motion to dismiss only where the failure to comply with the limitations period is apparent from the face of the pleadings.  Multiple cases suggest that Plaintiff Ahmad's claims may well be time-barred. *See generally Delaware State College v. Ricks*, 449 U.S. 250 (1980) (tenure decision); *Morse v. University of Vermont,* 973 F.2d 122 (2d Cir.1992) (where disabled student was terminated from master's program, internal administrative review of University's decision had no effect on when the statute of limitations for Rehabilitation Act claim period began to run); *cf. Babiker v. Ross Univ. Sch. of Med.,* 2000 WL 666342 at *9 n. 15 (S.D.N.Y. May 19, 2000) (section 1981 claim against medical school dismissed as beyond the statutory time period, even though plaintiff's internal appeal of his discharge occurred within the statutory time period); *Rapp v. Oregon Health Sciences University*, 972 F. Supp. 546 (D. Or. 1997) (same).

Despite this case law, the undersigned is reluctant to grant UC's motion to dismiss prior to any discovery on the issue.  Plaintiff does not contest UC's argument that any claims relating to events in 2010 are time-barred.  However, Plaintiff maintains that he was not finally dismissed until August 4, 2016, a date that falls just within the limitations period.  (*See* Doc. 9 at 9, arguing that the "decision to recommend Ahmad for dismissal made on June 29, 2016 was not a final decision as the Complaint makes clear that students have a right to appeal a PAC's initial recommendation for dismissal….").

Courts ordinarily will not grant a motion to dismiss on limitations grounds where

"the pleadings do not conclusively show that the plaintiffs' claims are barred." *Basile v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 551 F. Supp. 580, 582 (S.D. Ohio 1982); *see also Hensley Mfg. v. ProPride, Inc.*, 579 F.3d at 613. In the absence of this Court's ability to review the precise language of the June 29, 2016 communication from the PAC or any other exhibits attached to the pleadings that shed light on the matter, the undersigned declines to dismiss Plaintiff's claims as time-barred at this juncture. *Compare Datto v. Harrison*, 664 F. Supp.2d 472 (E.D. Penn. 2009) (holding based on explicit language in letter to doctoral student that possibility that decision could have been reversed on appeal did not change when the cause of action accrued); *accord Endres v. Ne. Ohio Med. Univ.*, 2018 WL 4002613 (N.D. Ohio Aug. 22, 2018) (dismissing similar claims based on exhibits attached to the complaint, holding that the disability discrimination claim accrued when the "decision to dismiss him was formally communicated" prior to the rejection of his appeal of that decision).

Plaintiffs have filed no formal motion seeking leave to amend. However, in a footnote, Plaintiff Ahmad "respectfully ask[s] the Court for leave to amend his complaint to add a claim for violation of his Due Process right as this [statute of limitations] argument by Defendants supports the conclusion that Ahmad's dismissal was a for[e]gone conclusion, notwithstanding his right to appeal and therefore a sham proceeding giving rise to claims for procedural due process violations." (Doc. 9 at 9 n.1). Plaintiffs' footnoted leap of logic makes no sense. Nothing in UC's legal argument supports a new claim. Certainly, the fact that a litigant loses an appeal proceeding does not ordinarily provide grounds for concluding that the ruling authority violated the litigant's procedural due process rights, or that the appeal result was somehow "fixed." Otherwise, virtually every litigant who loses any type of appeal could raise such a claim, with no more factual or

legal support for the claim than "I lost, therefore my constitutional due process rights must have been violated."  In short, this Court cannot agree that UC's legal argument provides any support for a new constitutional claim not previously asserted, even if Plaintiffs had filed an appropriate motion to amend.

### B. Count II - Title V Retaliation Claim Under the ADA

#### 1. Sovereign Immunity

The parties agree that the same result obtained by this Court concerning the applicability of sovereign immunity to Plaintiffs' Title II claim should apply to Plaintiffs' Title V retaliation claim.  *See generally McCollum*, 2010 WL 5393852 at *3 ("Where the underlying claim is predicated on alleged violations of Title II of the ADA, then the Title II abrogation of immunity is extended to ADA Title V retaliation claims.").  Because the undersigned has concluded that UC retains its sovereign immunity for the *specific* Title II claims at issue in this case, sovereign immunity also bars any Title V claims based on that same conduct.  *See Demshki v. Monteith*, 255 F.3d 986 (9th Cir. 2001) (because state was immune from suit under Title I of ADA, it was immune from suit for Title V retaliation claim predicated on Title I violation).

#### 2. Plaintiffs' Allegations Fail to State a Title V Claim

In the alternative, [9]  UC argues that Plaintiffs' allegations are insufficient to state a plausible retaliation claim under Title V, even assuming that Plaintiffs' dismissals from the College of Medicine are adverse actions and that they engaged in protected activity. UC maintains that the allegations fail to show UC had "actual knowledge" that Plaintiffs engaged in protected activity, including knowledge by the decision-maker(s).  UC points

---

[9]The undersigned addresses alternative issues for reasons of judicial economy, should any reviewing court disagree with the undersigned's sovereign immunity analysis.

out that neither Plaintiff identifies which UC official(s) he complained to or the dates of those complaints. Based upon the lack of identification of any specific individual, UC maintains that the allegations "do not support an inference that Defendants or any actual decision-makers harbored any retaliatory motive." *See EEOC v. Ford Motor Co.*, 782 F.3d 753, 767 (6th Cir. 2015) (affirming grant of summary judgment based on record presented). In turn, UC contends there is no "causal connection" between the dismissals and Plaintiffs' alleged protected activity.

The undersigned agrees that, unlike Plaintiffs' Title II allegations, the allegations supporting Plaintiffs' retaliation claim are simply too threadbare to make out such a claim under the ADA. In reaching this conclusion, the undersigned is guided by the analysis set forth in *Rhodes v. R & L Carriers, Inc.*, 491 Fed. Appx. 579, 583-584 (6th Cir. 2012), in which the Sixth Circuit reversed the dismissal of an age discrimination retaliation claim on grounds that the trial court had inappropriately required overly specific factual allegations at the pleading stage. *Rhodes* does not aid Plaintiffs here, however, because neither Plaintiff identifies any specific individual or, for that matter, any facts at all to support their claims. While both Plaintiffs allege in conclusory fashion that they "confronted Defendant for refusing to provide them accommodations for their conditions," (Doc. 1 at ¶71), neither identifies the timing or nature of the "confrontation" or provides any supporting detail that would allow this Court to draw a reasonable inference that Plaintiffs were subjected to dismissal from the College of Medicine in retaliation for their complaints of disability discrimination.

The most that Plaintiff Ahmad alleges is that "[b]efore and after his dismissal, [he] did complain that he was not receiving accommodations and was different treatment [sic] than non-minority students" and that *after* dismissal, he "did file a complaint with

Defendant putting it on notice for his disparate treatment in the Program." (*Id.* at ¶¶ 42-43). Obviously, a complaint of discrimination that did not occur until after dismissal could not support a claim that UC dismissed Plaintiff Ahmad in retaliation for his complaint. That leaves only the conclusory allegation by Plaintiff Ahmad that he "did complain" about his treatment to an unknown person or persons, in an undetermined fashion, prior to his dismissal. Plaintiff Omar offers only slightly more detail, alleging only that his brother Ahmad "filed a Complaint with Defendant after his [Ahmad's] dismissal," and that "Defendant further retaliated against Omar relating to his brother's Complaint against the Program." (*Id.* at ¶¶ 72 73). Plaintiff Omar also alleges that during his appeal process, he "confronted Defendant for failing to provide him accommodations and treating him differently" and that "Defendant's agents reacted with hostility to his comments during the appeal." (Doc. 1 at ¶¶56-57).

Plaintiffs protest that to require greater detail prior to discovery would be manifestly unfair. They suggest that requiring them to identify "the University officials to whom they complained…would require a discrimination plaintiff to state factual details that are rightfully subject to the discovery process." (Doc. 9 at 12). The undersigned disagrees. No discovery from UC should be required for Plaintiffs to identify some minimal level of detail within Plaintiffs' knowledge, such as the name or title of the person(s) to whom they allegedly complained, whether the complaints were oral or in writing, and/or a rough time frame of when they expressed those complaints. Plaintiffs' minimalistic and conclusory pleading would require this Court to draw inferences that are not plausible based on the face of the complaint, and do not surpass the relatively low bar of "notice pleading" required to state a retaliation claim. *Accord, Rhodes, supra.*

## C.  Count III - Rehabilitation Act ("RA")

"Because claims brought under Title II of the ADA and § 504 of the RA require proof of substantially similar elements, courts often treat the two in the same manner and analyze ADA and RA claims together."  *Gohl v. Livonia Public Schools*, 134 F. Supp.3d 1066, 1074 (E.D. Mich. 2015) (citing *S.S. v. E. Ky. Univ.*, 532 F.3d at 452-453) (analyzing claims together but recognizing that the Rehabilitation Act only covers federally funded entities and is limited to discrimination "solely" based upon disability).  Based upon the similarity of the two laws, UC first argues that Plaintiffs fail to state any plausible Rehabilitation Act claim for the same reason that Plaintiffs' allegations fail to make out a Title II claim under the ADA.  The undersigned rejects that argument for the reasons stated above.

However, UC additionally and more persuasively argues that even if this Court finds that Plaintiffs have stated a Title II claim, the Court still should conclude that Plaintiffs have not stated a Rehabilitation Act claim under that statute's stricter causation standard. *See, e.g.*, 29 U.S.C. § 794 and *Lewis v. Humbold Acquisition Corp., Inc.*, 681 F.3d 312, 315 (6th Cir. 2012) (holding that the two laws have "two distinct causation standards" with the Rehabilitation Act barring only discrimination that is based "solely by reason of" an individual's disability); *Anderson*, 798 F.3d at 357 n. 1 (holding that sole-causation standard does not apply to Title II ADA claims).  As UC points out, Plaintiffs allege that UC "ousted Plaintiffs from the medical program because of their disability," (Doc. 1 at ¶82) but fail to allege discrimination based *solely* on disability, instead alleging that UC discriminated against them based on a combination of their alleged disabilities, national origin and race.  (Complaint at ¶ 92).  Plaintiffs do not plead their claims in the alternative, but instead rely upon the same set of allegations for all claims.  (*See generally* Doc. 1 at

¶¶1, 17-22, 24, 29-31, 41-42, 44, 58; *see also* Doc. 9 at 5, arguing that "Plaintiffs were treated differently because of their disability compared to other students who requested accommodations, and specifically other non-minority students."). Because Plaintiffs clearly allege more than one cause of discrimination in a manner that is incompatible with relief under the Rehabilitation Act, they fail to state claims under that Act. Therefore, the undersigned recommends dismissal of that claim. *Accord Yates-Matttingly v. Univ. of Cincinnati*, Case No. 1:11-cv-753, 2012 WL 3779934 (S.D. Ohio Aug. 31, 2012) (dismissing Rehabilitation Act claim, holding that amendment of complaint to allege receipt of federal funds by UC would be futile because Plaintiff also failed to allege that her disability was the sole reason for her termination from UC as required to state a claim); *Doe v. BlueCross BlueShield of Tennessee, Inc.*, 2018 WL 3625012 at *4 (W.D. Tenn. July 30, 2018) (holding that amended complaint did not satisfy Rehabilitation Act's "solely because of" language).

Finally, unlike the distinct "discrimination" and "retaliation" ADA claims set forth in Plaintiffs' complaint, the complaint contains only a single count of "discrimination" under the RA. To the extent that Plaintiffs' complaint may be construed as containing an additional retaliation claim under the RA, the undersigned recommends dismissal of any such claim for the same reasons I have recommended dismissal of the ADA retaliation claim.

### D. Count V - Title VI of the Civil Rights Act

In Count V of their Complaint, both Plaintiffs allege that UC violated Title VI of the Civil Rights Act, 42 U.S.C. § 2000d.[10] Title VI provides in relevant part that "[n]o person

---

[10]The complaint identifies the relevant statute only by its abbreviated title, "Title VI."

in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." *Id.* UC construes Plaintiffs' allegations under Title VI as alleging distinct claims: (1) disparate treatment and/or direct discrimination through dismissal "because of [Plaintiffs'] national origin and race," (2) disparate impact discrimination through policies "designed to intentionally discriminate against similarly-situated non-white students," and (3) a "pattern and practice" claim of "systemic discrimination regarding students with different national origins during the support, dismissal and appeals processes." (Doc. 1 at ¶¶92-94).

In support of their Title VI claims, Plaintiffs allege that they were qualified to continue in medical school, but were discriminated against and ultimately dismissed from the College of Medicine "because of their national origin and race," insofar as they identify as Egyptian, Muslim male students.[11] (*Id.* at ¶¶ 90-92). Both allege that UC's "policies regarding the PAC review process are designed to intentionally discriminate against similarly-situated non-white students," and that UC "dismisses… minority-students at a rate surpassing its regional comparators." (*Id.* at ¶¶ 93, 95). Plaintiff Ahmad more specifically alleges that he was not provided the same level of counseling as "non-minority students," that he was forced to take 1.5 years off "which was disproportionate to [the PAC's] treatment of members outside [his] protected class," and that the PAC did not contact his advisor during the PAC process. (Doc. 1 at ¶¶30-33). In addition, Plaintiff

---

[11]Title VI does not expressly prohibit religious discrimination, notwithstanding Plaintiffs' repeated reference to their religious affiliation. *See Rosario de Leon v. Nat'l College of Business & Technology*, 663 F.Supp.2d 25, 34 (D.P.R. 2009). In a footnote in their response, Plaintiffs state that the complaint's use of the caption "National Origin and Race Discrimination" is a "scrivener's error insofar as the claim should more properly be labelled 'National Origin, Ethnicity, and Religious Discrimination.'" (Doc. 9 at 12-13, n. 2). Plaintiffs assert that the alleged error "does not change the substantive analysis but recognizes that 'Egyptian Muslim" refers to national origin, ethnicity and religious affiliation, not 'race.'" (*Id.*)

Ahmad alleges he was "forced…to endure an overly burdensome exam schedule" in comparison to other students, and that UC denied his appeal of the dismissal in contrast to an unidentified "non-minority student [who] was able to successfully appeal his dismissal." (*Id.* at ¶¶ 36, 37, 41).

Both Plaintiffs combine their allegations of race and/or national origin discrimination and disability discrimination. Thus, in support of his Title VI claim, Plaintiff Omar alleges that prior to his dismissal from medical school, UC "recommended Omar seek Islamic support," but otherwise denied him [disability-related] accommodations. In the only other allegations that specifically address his national origin, Plaintiff Omar alleges that his PAC "Appeal Panel…lacked any foreign nationals," and that he "confronted [UC] for ….treating him differently." (*Id.* at ¶¶ 55-56). Without elaboration, he alleges that UC treated him "differently than similarly-situated students who were not minorities." (*Id.* at ¶58). On the whole, UC argues that these allegations are too conclusory to state *any* type of claim on behalf of either Plaintiff under Title VI, whether characterized as a "disparate treatment," "disparate impact" or a "pattern or practice" claim.

Plaintiffs have conceded that they are not seeking to recover under a theory of disparate impact. (Doc. 9 at 13). S*ee also Alexander v. Sandoval*, 532 U.S. 275, 280 (2001) (holding there is no private right of action for disparate impact claim under Title VI, and that Title VI prohibits only intentional discrimination).[12]   As to UC's arguments that

---

[12]The Sixth Circuit also has rejected consideration of disparate impact evidence in support of an intentional discrimination claim under the ADA. "Acts and omissions which have a disparate impact on disabled persons in general are not specific acts of intentional discrimination against the plaintiff in particular." *Anderson v. City of Blue Ash*, 798 F.3d at 359-360 (additional internal quotation marks and citation omitted); *see also Lyon*, 2016 WL 6563422 at **2-3 (discussing disparate impact case law pertinent to ADA claims and citing *Crocker v. Runyon*, 207 F.3d 314, 320 (6th Cir. 2000) for the proposition that it remains unclear whether disparate-impact is cognizable under the Rehabilitation Act in the Sixth Circuit).

the allegations are insufficiently specific to support either a "disparate treatment" or a "pattern and practice" theory of liability, the undersigned again concludes that disparate treatment and pattern and practice are better viewed as theories of liability than as separate Title VI claims. Contrary to the assumptions in UC's argument, the undersigned has not located any controlling Sixth Circuit case law that requires a plaintiff who has otherwise stated an intentional discrimination claim under Title VI to identify a more specific theory of liability.[13]

At the same time, both Plaintiffs' allegations under Title VI are long on conclusions and short on factual detail. Giving the benefit of the doubt to both Plaintiffs, and construing all *reasonable* inferences in their favor, the undersigned finds Plaintiff Ahmad's allegations to be (barely) sufficient to state a claim that UC intentionally discriminated against him in violation of Title VI.[14] In contrast, however, Plaintiff Omar's conclusory assertion of national origin discrimination contains *no* supporting facts from which the undersigned can draw an inference sufficient to state a Title VI claim.

The undersigned writes briefly to address UC's argument that dismissal is also required because Plaintiffs have failed to sufficiently identify similarly-situated students under the *McDonnell Douglas* framework. It is unclear whether that framework would apply to Title VI claims that do not rely solely upon a disparate treatment theory of recovery. *See Johnson v. City of Clarksville*, 186 Fed. Appx. 592, 595 (6th Cir. 2006) (Assuming without deciding on summary judgment that *McDonnell Douglas* burden

---

[13]UC's arguments that Title VI does not support either a "disparate impact" type of claim along with its suggestion that Title VI does not expressly include a "pattern or practice" claim lend further support to the conclusion that stating a claim for intentional discrimination under Title VI is all that is required to survive a motion to dismiss. With that said, "pattern and practice" evidence is commonly used to prove disparate impact claims, for which no private action is recognized under Title VI.
[14]This finding is independent of the Court's analysis of potential statute of limitations issues concerning Plaintiff Ahmad's claims.

shifting applies to Title VI claims, affirming because plaintiffs failed to show that similarly situated members of the non-protected class received more favorable treatment than plaintiff received); *compare Heike v. Central Mich. University Bd. of Trustees*, 2011 WL 2602004 at *22 (E.D. Mich. July 1, 2011) (holding that collateral estoppel did not bar subsequent Title VI claim by plaintiff despite prior litigation of equal protection claim under 42 U.S.C. § 1983, based upon different standards of liability).   Because a claim of intentional discrimination under Title VI may be proven by either direct or indirect evidence, and therefore does not necessarily require a plaintiff to identify similarly situated individuals, the undersigned declines to recommend dismissal of Plaintiff Ahmad's Title VI claim on this basis. *See, generally, Keys v. Humana, Inc.*, 684 F. 3d 605 (6th Cir. 2012) (holding that African-American employee's allegations were sufficient to state claims of discrimination under Title VII and § 1981, because a plaintiff is not required to plead facts to establish a prima facie case under the *McDonnell Douglas* framework at pleading stage).[15]

### E.  Count VI – Retaliation Under Title VI of the Civil Rights Act

Count VI is Plaintiffs' retaliation claim under Title VI.  In that claim, Plaintiff Ahmad alleges that he complained of "different treatment than non-minority students" both "[b]efore and after his dismissal."  (*Id.* at ¶42).  Both Plaintiffs further allege that they "confronted and reported to Defendant that it did not accommodate their faith and/or treated them differently based upon their national origin and race," and that UC "denied Plaintiffs' appeals in retaliation for reported discrimination and unequal treatment in its

---

[15]UC attempts to distinguish *Keys* on grounds that in that case, the plaintiff had more specifically identified supervisors and other relevant persons by race and either name or company title. *Id.*, 684 F.3d at 610.  As discussed *infra*, Plaintiffs' identity of the PAC is sufficient identification of the decision-makers at the pleading stage.

program." (*Id.* at ¶¶ 100-101). UC argues that these allegations are legally insufficient to state a retaliation claim under Title VI of the Civil Rights Act.

The Sixth Circuit has not addressed whether Title VI would support a private right of action for retaliation. *Guardians Ass'n v. Civil Serv. Comm'n*, 463 U.S. 582, 593-95 (1983); *Johnson v. Galen Health Institutes, Inc.*, 267 F. Supp.2d 679, 690 n. 12 (W.D. Ky. 2003) (describing circuit split as to whether a plaintiff can sue for retaliation under Title IX and/or Title VI). Even assuming that a private cause of action for retaliation is permissible under Title VI, however, the undersigned agrees that Plaintiffs' failure to provide any factual detail to support their claim leaves both retaliation claims well short of the threshold of plausibility.[16] Consistent with the analysis of Plaintiffs' ADA retaliation claim, the undersigned concludes that a plaintiff is required to provide *some* factual detail concerning when and/or how he complained of discrimination based on race or national origin, and to whom, in order to state a claim.

## F. Counts VIII and IX – declaratory and injunctive relief

In Counts VIII and IX, Plaintiffs seek injunctive relief "enjoining [UC] from continuing to conduct itself in a manner that discriminates against its students on the basis of race and/or disability," and "a declaration that [UC's] policies and practices are unlawful." (Doc. 1 at ¶¶112, 114). Plaintiffs include a specific request for reinstatement into the College of Medicine. (Doc. 1 at 12).

UC argues that Plaintiffs' requests for relief cannot survive because they rest on allegations that fail to state any ADA, Rehabilitation Act, or Title VI claims. As Plaintiffs point out, (*see* Doc. 9 at 14), UC's arguments are premised on the conclusion that the

---

[16]Plaintiff Omar's retaliation claim also fails because he has failed to state an underlying claim of Title VI discrimination sufficient to support a retaliation claim.

entirety of Plaintiffs' ADA, Rehabilitation Act and Title VI claims will be dismissed. However, the undersigned has determined that Plaintiffs' allegations are sufficient to state Title II ADA claims, and that Plaintiff Ahmad has pleaded a claim of race and/or national origin discrimination under Title VI in a manner sufficient to survive UC's motion. Although sovereign immunity bars Plaintiffs' claims for monetary damages under the ADA, that same immunity does not bar Plaintiffs' claim for injunctive relief in the form of reinstatement to UC's College of Medicine. *See generally Ex parte Young*, 209 U.S. 123 (1908); *McCulley*, 2013 WL 1501994 at *4-5 (holding under *Ex parte Young* that immunity did not bar medical student's claim for injunctive relief). Accordingly, the undersigned recommends that UC's motion to dismiss claims for declaratory and injunctive relief be denied.

### G. Counts IV and VII – State Law Claims

In Count IV, Plaintiffs allege disability discrimination in violation of Ohio Revised Code § 4112. In Claim VII, Plaintiffs allege a "breach of contract" claim under state law based upon a "handbook" in which UC "agreed not to discriminate…based upon …race and national origin." (Doc. 1 at ¶ 105). Plaintiffs further allege that UC breached a contractual agreement "to accommodate Plaintiffs and not discriminate against them regarding their disabilities." (*Id.* at ¶106).

UC generally advocates dismissal of the state law claims on the basis of a lack of federal subject matter jurisdiction – an argument that appears premised on UC's arguments in favor of dismissal of *all* federal claims. Because the undersigned does not recommend dismissal of all federal claims at this time, supplemental jurisdiction over any related state law claims remains appropriate.

Unfortunately for Plaintiffs, they have not set forth any related state claims over

which this Court has jurisdiction. Only the Ohio Court of Claims has jurisdiction over Plaintiffs' asserted breach of contract or disability discrimination claim under state law, *see* Ohio Rev. Code § 2743.02(A)(1), and Plaintiffs remain barred from attempting to prosecute their state claims in any other forum by the doctrine of sovereign immunity.[17] *See also Stein v. Kent State University Bd. of Trustees*, 994 F. Supp. 898, 903 (N.D. Ohio 1998) (holding that a state anti-discrimination statute did not explicitly abrogate the state's Eleventh Amendment immunity from suit in federal court, but merely authorized suit in the Ohio Court of Claims); *Harris v. Dept. of Adm. Serv.*, 63 Ohio App. 3d 115, 119, 577 N.E.2d 1180 (Ohio Ct. App. 1989) (Ohio has waived its sovereign immunity for age discrimination claims only if filed in Court of Claims, which has exclusive jurisdiction); *Al-Maqablh v. University of Cincinnati College of Medicine*, 2012 WL 6675761 at *2 (S.D. Ohio Dec. 21, 2012) (holding that sovereign immunity bars consideration of any state law employment discrimination claims, citing *Dendinger v. Ohio*, 207 Fed. Appx. 521, 528-29 (6th Cir. 2006)). Because UC remains immune from federal suit under either the breach of contract theory or state antidiscrimination laws, Plaintiffs' state law claims should be dismissed. *Cf. generally, Min Li v. Qi Jiang*, 38 F.Supp.3d 870 (N.D. Ohio 2014) (Eleventh Amendment immunity bars suit in federal court for alleged state law claims based on race or national origin); *Williams v. Ohio Dep't of Mental Health*, 960 F. Supp. 1276 (S.D. Ohio 1997) (Eleventh Amendment bars suit against state for violations of Ohio statutes prohibiting disability discrimination); *Hall v. Medical College of Ohio at Toledo*, 742 F.2d 299 (6th Cir. 1984) (Eleventh Amendment bars suit by student dismissed from medical

---

[17]In its reply memorandum, UC asserts that Plaintiffs procedurally have abandoned their state law claims by failing to address this discrete portion of UC's motion to dismiss. Considering Plaintiffs' stated opposition to dismissal of their state claims on other grounds, (Doc. 9 at 14), and the cursory (two sentence) nature of UC's initial argument, the undersigned does not agree that Plaintiffs have abandoned their state law claims. Nevertheless, UC's substantive arguments prevail.

school).

### III.    Conclusion and Recommendations

For the reasons explained above, **IT IS RECOMMENDED THAT** UC's motion to dismiss Plaintiffs' claims in their entirety (Doc. 6) be **GRANTED ONLY IN PART**, with judgment to be entered in favor of Defendant(s) UC on Counts I and II (ADA claims except for the portion of Count I that seeks injunctive relief), Count III (Rehabilitation Act claims), Count IV (state discrimination claim), Count VI (Title VI retaliation claim); and Count VII (state breach of contract claim).  **IT IS FURTHER RECOMMENDED THAT** judgment be granted to UC and that the motion be **GRANTED** as to the portion of Count V in which Plaintiff Omar asserts a Title VI discrimination claim but **DENIED** as to the portion of Count V that sets forth Plaintiff Ahmad's claim.  Thus, proceedings should continue at present for Plaintiff Ahmad's Title VI discrimination claim and for both Plaintiffs' claims for injunctive and declaratory relief under the ADA.

 *s/ Stephanie K. Bowman*
Stephanie K. Bowman
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

AHMAD SAQR, et al.,

                                                   Case No: 1:18-cv-542

                  Plaintiff,                           Dlott, J.
    v.                                           Bowman, M.J.

THE UNIVERSITY OF CINCINNATI, et al.,

                  Defendants.

**NOTICE**

      Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to this Report & Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R.  That period may be extended further by the Court on timely motion by either side for an extension of time.  All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections.  A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections.  Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).