## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

**AHMAD SAQR,**

      **Plaintiff,**

                **v.**

**UNIVERSITY OF CINCINNATI, et al.,**

      **Defendants.**

      **Case No. 1:18-cv-542**
      **JUDGE DOUGLAS R. COLE**

### OPINION AND ORDER

This cause is before the Court on Defendants University of Cincinnati and University of Cincinnati College of Medicine's (together "UC") Motion for Summary Judgment (Doc. 65). For the reasons that follow, the Court **GRANTS** UC's Motion and **DISMISSES** Ahmad Saqr's claim for discrimination on the basis of race, color, or national origin, the sole remaining claim in this action, **WITH PREJUDICE**.

### BACKGROUND[1]

Ahmad Saqr, an Egyptian Muslim, began his time as a medical student at UC in August 2010. (Saqr Dep., Doc. 60, #465). Saqr struggled during his first semester, receiving failing grades in two courses and a low grade in a third. (1/7/11 Warning, Saqr Dep. Ex. 2, Doc. 60-2, #595). As a result, Saqr received an Academic Warning

---

[1] Many of the claims in Saqr's Complaint (Doc. 1) in this action have already been dismissed pursuant to the Court's September 8, 2020, Opinion and Order (Doc. 50). In what follows, the Court summarizes only the factual background relevant to Saqr's sole remaining claim in this action for race, color, or national origin discrimination under Title VI of the Civil Rights Act. *See id.*

on January 7, 2011. That Warning informed him that he would have to both pass all remaining classes during the spring term and successfully redo the two courses he had failed by the summer in order to avoid dismissal from UC. (*Id.* at #596). Instead, Saqr requested a leave of absence on March 3, 2011. (Saqr Dep., Doc. 60, #466; 03/03/11 Letter, Saqr Dep. Ex. 4, Doc. 60-4, #598). The Year One Promotions Board ("Promotions Board") granted Saqr's request and set his return date for August 2012. (3/26/12 Promotions Bd. Letter, Saqr Dep. Ex. 7, Doc. 60-7, #609). On March 26, 2012, and again on May 23, 2012, the Promotions Board advised Saqr that one more failing grade would be grounds for dismissal, as would failure to complete all basic science coursework within three years. (*Id.*; 5/23/12 Promotions Bd. Letter, Saqr Dep. Ex. 8, Doc. 60-8, #610).

During the 2012–2013 academic year, Saqr passed all of his first-year courses, including repeated courses. (Saqr Dep., Doc. 60, #469). Saqr then also passed all of his second-year courses during the 2013–2014 academic year. (*Id.* at #471). Saqr requested a second leave of absence to prepare for the "Step 1" exam, an exam administered by the United States Medical Licensing Examination and required at UC to begin the third-year medical curriculum. (*Id.* at #473). Despite again receiving his requested leave of absence, Saqr failed the Step 1 exam on August 9, 2014. (5/22/14 Promotions Bd. Letter, Saqr Dep. Ex. 16, Doc. 60-16, #891; Saqr Dep., Doc. 60, #472).

After failing the Step 1 exam, Saqr requested a third leave of absence during academic year 2014–2015 to study to retake it. (Saqr Dep., Doc. 60, #477). This time,

it was the Performance and Advancement Committee ("PAC") that granted that request. (10/15/14 PAC Letter, Saqr Dep. Ex. 22, Doc. 60-22, #903). On his second try, Saqr passed the Step 1 Exam on April 15, 2015. (Saqr Dep., Doc. 60, #478).

During their third year of study, UC medical students are required to take a number of "clerkships" in various medical practices. Clerkships have both a clinical component and a "shelf exam" component, with the latter administered by the National Board of Medical Examiners. Saqr began his third year of study at UC (now the 2015–2016 academic year) by enrolling in two such clerkships, Pediatrics and Obstetrics/Gynecology. (*Id.* at #480). Saqr passed the clinical portion of both clerkships, but failed the shelf exam portion of each. (11/2/15 PAC Letter, Saqr Dep. Ex. 27, Doc. 60-27, #910). Under the applicable Advancement and Retention Policy, the failure of these two shelf exams, combined with the fact that Saqr had on his first attempt failed two first-year courses and the Step 1 exam, was grounds for dismissal from UC. (Med. Student Handbook 2015–2016, Saqr Dep. Ex. 28, #917).

The PAC met to discuss Saqr's situation and determined that it would give him another chance: Saqr was to retake the shelf examinations for both Pediatrics and Obstetrics/Gynecology on makeup testing dates in either December 2015 or June 2016. (11/2/15 PAC Letter, Saqr Dep. Ex. 27, Doc. 60-27, #910). This time, Saqr did not take a leave of absence to prepare to retake his exams, but continued in his third-year curriculum coursework, including a clerkship in Internal Medicine with a scheduled shelf exam date of December 18, 2015. (12/8/15 Malosh Email, Saqr Dep. Ex. 32, #1013). Shortly before that scheduled exam date, Saqr petitioned for a fourth

3

leave of absence, which was granted on the condition that Saqr repeat the entire Internal Medicine clerkship (and not merely take the shelf exam) when he returned. (12/11/15 PAC Letter, Saqr Dep. Ex. 34, Doc. 60-34, #1016). Saqr availed himself of this option and took a fourth leave of absence from UC. (12/14/15 Saqr Email, Saqr Dep. Ex. 35, Doc. 60-35, #1017).

Saqr returned from his fourth leave of absence during the spring semester of 2016. In that semester, Saqr took a third core clerkship, the Psychiatry clerkship, in addition to continuing to study to retake the Pediatrics and OB/GYN shelf exams. (Saqr Dep., Doc. 60, #493). Accordingly, Saqr would take a total of three shelf exams in June 2016 (Pediatrics, Obstetrics/Gynecology, and Psychiatry). On June 23, 2016, Saqr failed the Obstetrics/Gynecology shelf exam for the second time. (Dismissal Letter, Saqr Dep. Ex. 46, Doc. 60-46, #1037).

On June 29, 2016, the PAC recommended that Saqr be dismissed from UC. (*Id.*). Saqr appealed that determination to UC's Grievance Committee. (8/4/2016 Grievance Comm. Letter, Saqr Dep. Ex. 53, Doc. 60-53, #1046). The Grievance Committee declined to overturn the PAC's decision. (*Id.*). The Dean of UC's College of Medicine approved the recommendations of the PAC and Grievance Committee (which was also called the Appeal Board) and dismissed Saqr from UC effective August 9, 2016. (8/9/16 Dean Letter, Saqr Dep. Ex. 54, Doc. 60-54, #1048).

Ahmad Saqr, along with his brother Omar, all of whose claims have already been dismissed from this action in the Court's September 8, 2020, Opinion and Order (Doc. 50), filed the Complaint (Doc. 1) in this action on August 3, 2018. Along with

other claims not now before the Court, Saqr alleged that UC discriminated against him on the basis of his race and national origin in violation of Title VI of the Civil Rights Act. (*Id.* at #10–11). UC moved for summary judgment (Doc. 65) on November 30, 2020. UC argues that Saqr has not produced evidence sufficient to create a genuine dispute as to whether UC dismissed Saqr because of his race or national origin rather than because of Saqr's poor academic performance. (*Id.* at #2415–18). Saqr responded in opposition (Doc. 68) on December 21, 2020, and UC replied (Doc. 70) on January 8, 2021. The matter is now fully briefed and before the Court.

## LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden is on the moving party to conclusively show that no genuine issue of material fact exists. *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994). Once the movant presents evidence to meet its burden, the nonmoving party may not rest on its pleadings, but must come forward with significant probative evidence to support its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Lansing Dairy*, 39 F.3d at 1347.

This Court is not obliged to search the record sua sponte for genuine issues of material fact. *Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1087 (6th Cir. 1996); *Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 404–06 (6th Cir. 1992). Instead, the nonmoving party must "designate specific facts or evidence in dispute." *Jordan v. Kohl's Dep't Stores, Inc.*, 490 F. App'x 738, 741 (6th Cir. 2012) (quotation omitted). If

the nonmoving party fails to make the necessary showing for an element upon which it bears the burden of proof, then the moving party is entitled to summary judgment. *Celotex Corp.*, 477 U.S. at 323.

Granting summary judgment depends upon "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Amway Distribs. Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)). In sum, the nonmoving party, at this stage, must present some "sufficient disagreement" that would necessitate submission to a jury. *See Moore v. Phillip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993) (quoting *Anderson*, 477 U.S. at 251–52). In making that determination, though, the Court must view the evidence in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) ("In arriving at a resolution, the court must afford all reasonable inferences, and construe the evidence in the light most favorable to the nonmoving party.").

## LAW AND ANALYSIS

The operative provision of Title VI of the Civil Rights Act of 1964, codified at 42 U.S.C. § 2000d, states as follows: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." Here, there is no dispute that UC receives

federal financial assistance. (Mot. for Summ. J. ("Mot."), Doc. 65, #2412). Nor can anyone dispute that Saqr's dismissal from UC's medical program excluded him from further participation therein.[2] But UC contends that the undisputed evidence shows that it dismissed Saqr for poor performance, rather than on account of discrimination. Accordingly, Saqr's claims should survive summary judgment if (and only if) he can point to evidence sufficient to create a genuine dispute as to whether UC dismissed him "on the ground of race, color, or national origin."

Title VI prohibits only intentional discrimination. *Alexander v. Sandoval*, 532 U.S. 275, 280–81 (2001). Evidence of intentional discrimination may be direct or indirect. Direct evidence of a discriminatory motive might take the form, for example, of a decisionmaker's explicit statement that she took a particular action because of an individual's national origin. *Paasewe v. Ohio Arts Council*, 74 F. App'x 505, 507 (6th Cir. 2003) (citing *Smith v. Chrysler Corp.*, 155 F.3d 799, 805 (6th Cir. 1998)). As for indirect evidence, while there is some uncertainty about the exact test, courts in this circuit and district have most often borrowed the burden-shifting framework first articulated by the Supreme Court for the Title VII employment discrimination

---

[2] This case is about Saqr's dismissal from UC. True, Saqr also alleges that, while enrolled at UC, he "did not receive the same level of support of other students in Defendant's program." (Compl., Doc. 1, ¶ 96). But, as discussed in more detail below, Saqr has failed to point the Court to any action by UC other than eventually dismissing Saqr that might qualify as exclusion from participation, denial of benefits, or discrimination. *See* 42 U.S.C. § 2000d; *see also Jordan*, 490 F. App'x at 741 (nonmoving party must designate specific facts or evidence in dispute). Accordingly, the Court need not, and does not, decide whether the statute of limitations would bar any claims by Saqr based on actions by UC other than UC's final dismissal of Saqr, because Saqr has not met his burden on summary judgment to point the Court to any such actions. (*See* Mot., Doc. 65, #2413). Naturally, the Court may, and does, consider record evidence regarding events that occurred before Saqr's dismissal was finalized in order to determine whether that dismissal itself may have violated Title VI.

context in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *See Johnson v. City of Clarksville*, 186 F. App'x 592, 595 (6th Cir. 2006) (assuming without deciding that the *McDonnell Douglas* framework applies); *Paasewe*, 74 F. App'x at 507 (applying the *McDonnell Douglas* framework); *Amadasu v. Donovan*, No. 1:10-CV-210, 2006 WL 1401648, at *7 (S.D. Ohio May 18, 2006) (same).

Under the *McDonnell Douglas* burden-shifting framework, as adapted by the Sixth Circuit to fit the Title VI context, a plaintiff bears the initial burden of showing that: "(1) [he] is a member of a protected class, (2) [he] suffered an adverse action at the hands of the defendants in the pursuit of [his] education, (3) [he] was qualified to continue in [his] pursuit of [his] education; and (4) [he] was treated differently from similarly situated students who are not members of the protected class." *Bell v. Ohio State Univ.*, 351 F.3d 240, 253 (6th Cir. 2003) (citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992)). If a plaintiff can establish the prima facie case, then the burden shifts to the defendant to identify a legitimate, non-discriminatory reason for the adverse action. *See McDonnell Douglas*, 411 U.S. at 802. If the defendant does so, then the burden shifts back to the plaintiff to show that the defendant's stated non-discriminatory reason for the adverse action was pretextual. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981). "[A] plaintiff can show pretext in three interrelated ways: (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the [defendant's] action, or (3) that they were insufficient to motivate the [defendant's] action." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009).

In this case, the parties have also briefed the issue under an alternative legal standard, namely that established by the Supreme Court's decision in *Village of Arlington Heights v. Metro Housing Development Corporation*, 429 U.S. 252 (1977). (*See* Resp. in Opp'n to Mot. for Summ. J. ("Opp'n"), Doc. 68, #2874; Reply in Supp. of Mot. for Summ. J. ("Reply"), Doc. 70, #2897). While *Arlington Heights* itself is a constitutional case about zoning arising under the Equal Protection Clause, its application in the Title VI context would not appear wholly unwarranted given the parallelism in legal standards for claims of discrimination in education under the Equal Protection Clause and Title VI. *See Grutter v. Bollinger*, 539 U.S. 306, 343–44 (2003) (citation omitted). And indeed, the *Arlington Heights* standard shares some similarities with the *McDonnell Douglas* framework. Specifically, courts analyzing a claim of discrimination under *Arlington Heights* consider factors including the historical background of a decision (especially if it reveals a pattern of unfavorable treatment of members of the group in question), the sequence of events leading up to the decision (especially if that sequence departs from normal procedures), departures from established substantive standards for a decision (especially where those standards would have led to a different outcome), and any statements that might shed light on the intent of members of the decisionmaking body. *See Coal. for Advancement of Reg'l Transp. v. Fed. Highway Admin.*, 576 F. App'x 477, 493–94 (6th Cir. 2014) (citing *Arlington Heights*, 429 U.S. at 266–68). Much as with the *McDonnell Douglas* framework, where a plaintiff presents some evidence of a discriminatory motive, the burden then shifts to the defendant to show that the same

9

decision would have resulted even in the absence of such a motive. *Arlington Heights*, 429 U.S. at 271 n.21.

Here, Saqr presents no direct evidence of discrimination. That is, Saqr does not argue that UC engaged in any explicit classifications based on race or nationality that led to his dismissal, nor does he cite any statements by decisionmakers at UC that even refer to his race or nationality, much less indicate that it was a reason for his dismissal from UC. *See Paasewe*, 74 F. App'x at 507. Accordingly, Saqr must rely on indirect evidence, which the parties have argued alternatively under both the *McDonnell Douglas* and the *Arlington Heights* frameworks discussed above. However, the Court need not decide which of these frameworks applies, because Saqr has presented insufficient evidence to create a genuine dispute of material fact under either standard.

Under the *McDonnell Douglas* burden-shifting framework, Saqr first fails to create a genuine dispute as to whether he was qualified to remain in his degree program.[3] *See Bell v. Ohio State Univ.*, No. 2:98-CV-1274, 2002 WL 193694, at *40

---

[3] In summary judgment cases such as this one, there is some tension between the *McDonnell Douglas* notion of "burden-shifting," which implies that the initial evidentiary burden is on the plaintiff, and the summary judgment standard, which instead requires the moving party (here, the Defendants) to demonstrate the absence of a genuine dispute of material fact. *See Burress v. Spring Grove Cemetery & Arboretum*, Case No. 1:18-cv-879, 2020 WL 3036047, at *8 (S.D. Ohio June 5, 2020). But that tension is no more intractable than in any other context in which the non-moving party has the ultimate burden of proof on an element of its claim. *See, e.g., Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000) ("The test [on summary judgment] is 'whether the party bearing the burden of proof has presented a jury question as to each element in the case.'" (quoting *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996))). Accordingly, applying the *McDonnell Douglas* framework on summary judgment requires the Court to proceed through the stages of that framework and ask whether the party that would bear the burden at trial has produced evidence sufficient to create a genuine dispute at the stage in question. *See Burress*, 2020 WL 3036047, at *8 (quoting *Macy v. Hopkins Cnty. Sch.*

(S.D. Ohio Feb. 5, 2002), aff'd *Bell*, 351 F.3d 240 (poor academic performance showed lack of qualification to continue in program). As the factual exposition above amply demonstrates, despite second, third, and fourth chances, Saqr repeatedly and consistently failed to fulfill the minimum requirements of UC's medical program. When Saqr failed the two shelf exams—national examinations whose content is not determined by UC—after having already failed two required first-year exams and the Step 1 exam, that was grounds for dismissal under UC's Advancement and Retention Policy. (Med. Student Handbook 2015–2016, Saqr Dep. Ex. 28, Doc. 60-28, #917). Instead of dismissing him, though, the PAC gave Saqr one last chance to retake the two shelf exams. Only when Saqr failed the Obstetrics/Gynecology exam for a second time did the PAC decide to dismiss him from UC. The Court intends no disrespect to Saqr's efforts or to whatever circumstances may help account for his poor academic performance. But on this record, there is no genuine dispute that Saqr was not qualified to continue in UC's medical program when UC dismissed him from it.

Saqr does not seriously attempt to rebut this objective evidence of lack of qualification to remain in the UC medical program based on poor academic performance. Instead, Saqr argues that, because he alleges that UC failed to support minority students including himself, the Court must presume that, but for such failure, Saqr would not have had poor academic performance. (Opp'n, Doc. 68, #2871). This audacious chain of inferences lacks factual or legal support. *See Gregg v. Ohio Dep't of Youth Servs.*, 661 F. Supp. 2d 842, 859 (S.D. Ohio 2009) (declining to "stack

---

*Bd. of Educ.*, 484 F.3d 357, 364 (6th Cir. 2007), abrogated on other grounds by *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312 (6th Cir. 2012)).

inference upon inference to preserve an issue for the jury"). Factually, Saqr points the Court to no specific failure to support him on UC's part, much less to any evidence that, but for such failure, Saqr would have succeeded in medical school. On the contrary, in response to his repeated requests for additional support, Saqr received individualized consideration and accommodations including leaves of absence, which UC granted without exception until his final dismissal. Moreover, as UC notes, Saqr cannot point the Court to any instance prior to his dismissal from UC in which Saqr notified UC of any failure to provide Saqr with academic support or resources. (Mot., Doc. 65, #2414 n.8 (citing *Mahdy v. Mason City Sch. Dist.*, Case No. 1:16-cv-845, 2018 WL 1327211, at *7 (S.D. Ohio Mar. 15, 2018) (to establish requisite intent, student must have notified school official of allegedly discriminatory failure to provide support))). Accordingly, Saqr's suggestion that he would have performed differently had UC not failed to support him in some unspecified way is baseless.

Equally importantly, there is no legal basis for Saqr's proposed counterfactual method of satisfying the third prong of the *McDonnell Douglas* framework. Saqr cites the proposition that it is "inappropriate for the district court in the pre-trial stage to rely on the nondiscriminatory reason for termination to find plaintiff's prima facie case inadequate," but instead "a court must examine plaintiff's evidence independent of the nondiscriminatory reason … for terminating the plaintiff." *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660–61 (6th Cir. 2000). This principle serves to avoid confusion between the different stages of the burden-shifting framework by counseling the district court to defer consideration of the defendant's stated rationale

12

for the adverse action when evaluating the prima facie case. *See id.* Hence, in determining whether a plaintiff was qualified, a court should not consider the defendant's own representation that it terminated the plaintiff because of the plaintiff's lack of qualification. But that does not mean that the court must assume that the plaintiff *was* qualified (or, as Saqr would have it here, would have been qualified but for the defendant's discrimination). Besides being counterintuitive, such a requirement would all but eviscerate the qualification prong of the *McDonnell Douglas* framework. Instead, a court must evaluate the "plaintiff's evidence," without regard for the defendant's stated rationale of lack of qualification, to determine whether there is a genuine dispute as to whether the plaintiff was in fact qualified to continue in the program. *See Cline*, 206 F.3d at 661. And so the Court does here. Because the only conclusion consistent with the summary judgment record is that Saqr was not qualified to continue in his program, he has not met his burden to establish this required element of the *McDonnell Douglas* prima facie case.

Saqr argues that the Court should conclude that he was qualified to continue at UC (or at least that there is a genuine dispute as to this element) because of positive statements about him in the record by UC faculty members. For example, Dr. Ashley Jenkins, then Internal Medicine and Pediatrics Chief Resident at UC, wrote a letter to the PAC expressing that Saqr "was an enthusiastic learner" whose "strengths include his communication skills and ability to connect with patients and their families." (Opp'n, Doc. 68, #2872 (citing Jenkins Letter, Malosh Dep. Ex. 8, Doc. 62-8, #1601)). Dr. Goodlander, who identified herself as the preceptor for Saqr's

13

outpatient pediatric rotation, stated that Saqr's "integrity, compassion, professionalism, and interest in learning are above reproach" and that she "would highly recommend him for any medically related endeavors based on my month of clerkship." (*Id.* (citing Goodlander Letter, Malosh Dep. Ex. 10, Doc. 62-10, #1604)). Notably, though, although these were letters sent to the PAC in connection with Saqr's pending dismissal, neither letter stated that Saqr should not be dismissed from UC. That being said, Dr. Marc Rothenberg, a faculty member in whose lab Saqr worked during his first year of medical school, did write a letter to the PAC explicitly "to appeal the dismissal of Ahmad Saqr," stating "I urge you to maintain him in the medical school" and recounting Saqr's "helpfulness" to Rothenberg's division. (Rothenberg Letter, Malosh Dep. Ex. 11, Doc. 62-11, #1607–09).

In support of its motion, UC argues that the Court should not consider these unsworn, unauthenticated letters at the summary judgment stage. The Court agrees. *See Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) ("[U]nauthenticated documents do not meet the requirements of Rule 56(e).") (citations omitted). But even if the Court were to consider these letters to the PAC, they would not create a genuine dispute as to whether Saqr was qualified to continue in his program. None of the letters even asserts that Saqr was qualified to remain at UC, much less explains how that conclusion could be consistent with his repeated failures of examinations required of all students to an extent that warranted dismissal under UC's own Advancement and Retention Policy. To infer from these letters that Saqr was qualified to continue his studies at UC, the Court would have to assume that medical

school requires only the positive personal characteristics to which their authors refer—and that it does not also require satisfaction of objective academic criteria after any number of attempts. Because that is not a reasonable assumption, Saqr has not created a genuine dispute as to whether he was qualified to remain at UC. *See Cox*, 53 F.3d at 150 (court affords *reasonable* inferences to nonmoving party).

True, the Rothenberg Letter could perhaps support a reasonable inference that Rothenberg believed Saqr to be qualified to remain in UC's medical program. But even so, that subjective (and largely unexplained) belief on the part of a single faculty member would not be enough to create a genuine dispute where so much objective evidence of Saqr's poor academic performance points in the opposite direction. *See Amway,* 323 F.3d at 390 (grant of summary judgment appropriate where evidence "so one-sided that one party must prevail as a matter of law"). Especially in light of this Court's obligation to afford UC "the widest range of discretion in making judgments as to the academic performance of students and their entitlement to promotion or graduation," a single faculty member's more or less unexplained contrary opinion, however sincerely held, would not on its own create a genuine dispute as to Saqr's qualification to remain at UC. *See Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 225 n.11 (1985) (citation omitted).

Finally, Saqr argues that because UC admitted Saqr to its medical program, it must have determined that he was qualified to complete the program. (Opp'n, Doc. 68, #2872). Again, to grant Saqr the benefit of such an inference as a matter of law would have the sweeping consequence that any student, once admitted, would always

15

remain qualified, thus effectively rendering the third prong of the *McDonnell Douglas* framework a dead letter. But Saqr cites, and the Court finds, no legal support for such an argument. Instead, the Court agrees with UC that it is eminently sensible to distinguish between an *applicant's* qualifications to be accepted into an academic program and a *current student's* qualifications to *continue* in the program after having completed some but not all of it. (Reply, Doc. 70, #2891–92). UC does not argue, nor need it, that it made a mistake in assessing Saqr's qualifications to enroll in the medical program when it admitted Saqr. Instead, UC argues that Saqr's poor academic performance in the course of his studies, which necessarily occurred after his admission to UC, eventually rendered Saqr unqualified to continue in the pursuit of those studies. Because poor academic performance can make a student unqualified to continue in a degree program, the Court concludes that Saqr's initial admission to UC's medical program does not, in itself, establish that he was also qualified to continue in the third year of that program after failing so many required examinations over the course of a total of six academic years. *See Bell*, 2002 WL 193694, at *40.

To be sure, nothing in Title VI affirmatively *requires* institutions to maintain only qualified students in their degree programs. Thus, on this record, it may be that UC *could* justifiably have declined to dismiss Saqr, and instead given him even more chances to successfully complete his studies. But that is not the question before the Court. Instead, the question is whether Title VI *forbade* UC from dismissing Saqr as a student. Because there is no genuine dispute that, at the time of his dismissal,

Saqr's poor academic performance showed that he was not qualified to continue in the program, Saqr's claim fails under the *McDonnell Douglas* framework.

Under the same framework, Saqr's claim fails for the separate reason that he has not identified similarly-situated individuals who are not members of his protected class and who were treated differently by UC.[4] Saqr argues that two students, whom he identifies as C1 and A1 and says are white, are both similarly-situated comparators who were not dismissed from UC and eventually graduated.[5] (Opp'n, Doc. 68, #2873–74). Saqr says that, like himself, C1 failed the Step 1 exam and took a leave of absence to study, but, unlike Saqr, C1 also failed the Step 1 exam a second time and required a third attempt to pass. (*Id.* at #2873). Likewise, Saqr says that A1 failed two classes in his first year, withdrew, and passed all first- and second-year classes upon his return, but then failed the Step 1 exam. (*Id.* at #2873–74).

Saqr's evidence does not show that similarly-situated white students were treated differently from Saqr. If anything, Saqr's evidence suggests that Saqr was treated similarly to C1 and A1 for as long as his academic situation resembled theirs. Saqr relies on the fact that C1 and A1 each failed either a first-year course or the Step 1 exam, but elides the fact that Saqr himself also was not dismissed from UC

---

[4] At this point, it is appropriate to note some indeterminacy in the bounds of that protected class. Saqr identifies himself as Egyptian, Muslim (albeit this is a religion, not a race, color, or national origin), and a "minority" student more generally, while UC also suggests that Saqr is "African-American." (*See* Compl., Doc. 1, ¶¶ 1, 24, #2, 4; Mot., Doc. 65, #2415). For the sake of argument, the Court assumes that the allegedly similarly-situated comparator students are not members of any protected group recognized by Title VI to which Saqr may belong.

[5] The Court refers to the purported comparator students by these designations as the parties do.

after failing two first-year courses and the Step 1 exam on the first try. Instead, Saqr received opportunities to redo those requirements, just like C1 and A1 did. It was only after Saqr also failed the shelf exams for two required third-year clerkships, and failed one such exam a second time, that UC finally dismissed Saqr from its medical program. Saqr does not suggest or present evidence that C1 or A1 failed a third- or fourth-year requirement after being given opportunities to redo their first- and second-year requirements, opportunities of which Saqr also availed himself.

Looked at another way, during his time at UC, Saqr failed examinations required to pass medical school no fewer than six times: two first-year course examinations, the Step 1 exam, the Pediatrics shelf exam, and the Obstetrics/Gynecology shelf exam twice. By contrast, C1 failed the Step 1 exam twice, and A1 failed two first-year courses and also failed the Step 1 exam once. Accordingly, Saqr failed a required exam at least twice the number of times as either of the purported comparator students. In the same vein, Saqr took four leaves of absence before failing one of his shelf exams for the second time, whereas C1 and A1 each needed only one or two leaves of absence to complete the requirements of UC's medical program.

From still another standpoint, Saqr's repeated exam failures were explicitly grounds for dismissal from UC under its Advancement and Retention Policy, whereas, under the same policy, students are explicitly allowed to take the Step 1 exam a third time, as C1 did, if permitted to do so by the PAC. (*See* Med. Student Handbook 2015–2016, Saqr Dep. Ex. 28, Doc. 60-28, #917, 920).  Thus, Saqr has not

established that C1 and A1 are similarly-situated white students who were treated differently from him. Again, if anything, C1 and A1 were treated similarly to Saqr to the extent that their academic situations were similar. *See Jackson v. VHS Detroit Receiving Hosp.*, 814 F.3d 769, 777 (6th Cir. 2016) (noting that "more severe treatment of more egregious circumstances" does not justify inference of discriminatory motive) (citation omitted).

In sum, given the undisputed evidence regarding his repeated academic failures, Saqr cannot create a genuine dispute as to whether he was qualified to remain as a medical student at UC, nor can he point to evidence that creates a genuine dispute as to whether he was treated differently from other similarly-situated individuals who were not members of his protected class. Because Saqr cannot meet his burden as to either of these elements under the *McDonnell Douglas* framework, it follows *a fortiori* that he would not be able to meet the heightened burden of showing that UC's stated reason for dismissing him—namely his lack of qualification to continue in the program—was in reality a pretext for discrimination on the basis of race, color, or national origin. First, because Saqr was not qualified to continue in his program, UC's stated reason for dismissing him has a basis in fact. *See Chen*, 580 F.3d at 400. Second, as discussed above, Saqr has not presented direct evidence that any UC decisionmaker was in fact motivated by considerations other than Saqr's lack of qualification to continue at the medical school, nor has Saqr's indirect evidence created a genuine dispute as to whether he was treated differently from similarly situated white medical students. Thus, Saqr cannot show that his lack

of qualification did not actually motivate, or was insufficient to motivate, UC's dismissal. *See id.* For these reasons, even if Saqr had established a *McDonell Douglas* prima facie case, which he has not, he cannot meet the higher burden to show that UC's stated rationale for his dismissal, poor academic performance, was a pretext for intentional discrimination on the basis of race, color, or national origin under Title VI. *See Burdine*, 450 U.S. at 255 (requiring "new level of specificity" at pretext stage).

Assuming for purposes of the instant Motion that the factors discussed in *Arlington Heights* could supply Saqr an alternate path to proving intentional discrimination under Title VI, as the parties appear to do (*see* Reply, Doc. 70, #2897), the Court nevertheless concludes that Saqr has not met his burden. As discussed above, the *Arlington Heights* factors include any decisionmakers' statements indicative of their motives, any departures from established procedural or substantive standards for a decision, and the institution's prior history and sequence of events leading to the decision. *See Reg'l Transp.*, 576 F. App'x at 493–94. As before, Saqr points to no statements by decisionmakers that even mention his race, color, or national origin, much less refer to it as a reason for his dismissal from UC. Saqr also cannot point to any departures from the established procedural and substantive standards for his dismissal. Instead, Saqr received multiple opportunities to complete the requirements of his program and was dismissed under circumstances that more than warranted this outcome according to UC's Advancement and Retention policy. (Med. Student Handbook 2015–2016, Saqr Dep. Ex. 28, Doc. 60-28, #917). Moreover, Saqr availed himself of the appeals process provided for in the student handbook. (*Id.*

20

at #927). Saqr has pointed the Court to no procedural or substantive irregularity in connection with his dismissal, let alone irregularities sufficient to support an inference to intentional discrimination on the basis of race, color, or national origin.

Nevertheless, Saqr argues that the "sequence of events" shows that UC wanted to dismiss Saqr from the program because Saqr was scheduled to take three shelf exams during a two-week period, an unusually burdensome exam schedule. (Opp'n, Doc. 68, #2875). But this ignores the fact that it was Saqr himself who chose this exam schedule after failing two of his shelf exams in October 2015. As UC points out, Saqr could instead have chosen to take one or both of his repeated shelf exams in Pediatrics and Obstetrics/Gynecology in December 2015. (Reply, Doc. 70, #2899–2900). Had he done that, he would not have had to take three shelf exams during a two-week period. So the timing of Saqr's shelf exams is not evidence that UC had it in for Saqr, much less that this was on account of Saqr's race, color, or national origin. If anything, the entire sequence of events leading to Saqr's dismissal instead suggests that UC was determined to give Saqr every reasonable opportunity to fulfill the requirements of its medical program.

Saqr makes much of an isolated comment by UC Professor D.J. Lowrie, a PAC member, in an email to the PAC. In that email, Lowrie states that the recommendation for Saqr's dismissal to be officially decided at the following meeting would only be "a rubber stamp" after Saqr failed another shelf exam. (Lowrie Email, Doc. 62-14, #1612). Saqr mischaracterizes Lowrie's comment as suggesting that, despite all the chances UC had given Saqr up to that point, Lowrie (and therefore

21

UC) somehow wanted Saqr to fail and "stacked the odds" to put him in a position where he would do so. (Opp'n, Doc. 68, #2866, 2875). On the contrary, Lowrie's comment is perfectly innocent: Lowrie's email states only that *if* Saqr failed again, as the PAC was justifiably concerned that he might, then the discussion of whether to dismiss him at the next meeting would be "a rubber stamp *because the PAC had already considered what to do in that case* at the "emergency meeting" whose deliberations Lowrie was summarizing in the email in question. (Lowrie Email, Doc. 62-14, #1612). Lowrie's email thus provides no support for Saqr's theory that the PAC somehow planned to ensure that Saqr fail an exam whose content was determined by a national medical licensing board, much less that it did so out of discriminatory animus on the basis of Saqr's race or national origin. Instead, Lowrie's email shows that even in November 2015, after Saqr had at some point failed a total of five separate examinations required to complete the medical degree program, the PAC still desired to give Saqr "one more chance"—but only one more. (Lowrie Email, Doc. 62-14, #1612). If UC had desired to be rid of Saqr, it could have dismissed him then and there instead under its Advancement and Retention Policy. (Med. Student Handbook 2015–2016, Saqr Dep. Ex. 28, Doc. 60-28, #917).

Saqr also argues (without specifying which *Arlington Heights* factor he is satisfying) that UC does not have academic support programs specifically for minority students. But Saqr points the Court to no legal authority, and the Court finds none, for the proposition that the absence of such racially-designated academic services justifies an inference that the dismissal of a particular student constituted

intentional racial discrimination. Finally, Saqr argues that UC "admits" to having a "long-standing history of institutional racism" because it has an "Anti-Racism Task Force" whose mission statement says as much. (Opp'n, Doc. 68, #2876). But again, what is missing from this record is any evidence that would tie any such generalized history of racism to the specific decision to dismiss Ahmad Saqr from UC's medical school. That is a problem because, to prevail on his claim, Saqr ultimately must prove (and thus at the summary judgment stage must create a genuine dispute) that UC intentionally discriminated against *him* because of *his* race or national origin when it dismissed him from its medical program. *Sandoval*, 538 U.S. at 280–81.

Furthermore, even if Saqr had produced some indirect evidence of discriminatory motive under the *Arlington Heights* factors, which he has not, UC would still have the opportunity to prove that it would have made the same decision even absent consideration of Saqr's race or national origin. *See Arlington Heights*, 429 U.S. at 271 n.21. Based on the undisputed evidence of Saqr's repeated poor academic performance, combined with the absence of any direct evidence of discrimination, the Court considers that, even if Saqr had presented "some" indirect evidence of a discriminatory motive under the *Arlington Heights* factors (which he has not), UC would still be entitled to summary judgment on the alternative grounds that UC would have dismissed Saqr even had it not considered Saqr's race or national origin (which, again, the Court sees no evidence that UC in fact did). *See id.*

Considered under whatever legal test, Saqr's Title VI discrimination claim fails on the merits. A reasonable jury could not conclude, on the basis of this record, that

UC dismissed Saqr because of his race, color, or national origin rather than because Saqr's repeated instances of poor academic performance rendered him unqualified to continue in the medical program.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** UC's Motion (Doc. 65) and **DISMISSES WITH PREJUDICE** Saqr's Title VI discrimination claim against UC. The Court **DIRECTS** the Clerk to enter judgment and **TERMINATE** this case on its docket.

**SO ORDERED.**

December 22, 2021
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**